W. R. Buckley v. Commissioner.
W. Buckley v. Commissioner
Docket No. 17134.
United States Tax Court
1949 Tax Ct. Memo LEXIS 139; 8 T.C.M. (CCH) 620; T.C.M. (RIA) 49161; June 27, 1949
*139 Cornelius C. O'Brien, Esq., Land Title Bldg., Philadelphia, Pa., for the petitioner. Karl W. Windhorst, Esq., for the respondent. MURDOCK
Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in income tax of $26,462.58 for 1943 and $27,119.21 for 1944. The only issue for decision is whether the Commissioner erred in taxing all of the income of Buckley Amusement Enterprises to the petitioner who had reported only one-fourth of that income on the theory that he was an equal partner with his wife, his daughter, and his sister in conducting that business. Findings of Fact The petitioner is a physician who has resided for many years at Mount Carmel, Pennsylvania. His returns for the taxable years were filed with the collector of internal revenue for the twelfth district of Pennsylvania. The petitioner's mother's name was Mary J. Buckley. His wife's name is Mary E. Buckley. Their only child's name is Mary Louise Buckley and his sister's name is Mary Estelle Buckley. Mary Louise Buckley was born on July 5, 1920. The petitioner has been engaged in the practice of medicine in Mount Carmel at least since 1920, but his practice was small *140 during the taxable years and for some time prior thereto. He has been a director in a bank in Mount Carmel since 1920 and one of the principal stockholders in a corporation which has been in the motion picture theatre business since about 1928. The petitioner leased an old opera house in Mount Carmel in 1931 and started to remodel it as a motion picture theatre. He did not have sufficient funds to complete the project and he formed an oral partnership with Benjamin Bodner. They completed the remodeling of the theatre and opened it as a motion picture house on December 15, 1931. It was called the State Theatre. They leased the Capitol Theatre in Shamokin and opened it as a motion picture theatre in 1933. That partnership continued until September 8, 1934. Bodner had indicated a desire to sell his interest and the petitioner agreed to buy it for $7,000. He gave Bodner his check for $7,000 on September 8, 1934 with the understanding that Bodner would hold it until the petitioner could put sufficient money in his bank account to pay the check. The petitioner borrowed $3,500 from a bank in Mount Carmel on October 31, 1934, which he placed in his checking account at another bank in that *141 town. A check for $947.50, which his wife had received as a partial distribution of her father's estate, was also deposited in the petitioner's bank account on that day, together with $352.50 which the petitioner had obtained from his mother. The petitioner then notified Bodner that he could cash the check for $7,000 and that check was cashed on October 31, 1934. The balance in the account after the check was cashed was three cents. The father of the petitioner's wife had died in August 1934 and she received assets in the distribution of his estate. She wanted to put some of that property into the motion picture business with her husband. The petitioner had borrowed money from his father-in-law and given his promissory notes to secure the loans. Two of those notes formed a part of the father-in-law's estate at the time of his death. One was for $1,500, dated April 9, 1927, and the other was for $2,000, dated August 1, 1929. The petitioner's wife received a letter dated October 29, 1934 from an attorney handling the estate of her father, in which he enclosed the two notes just mentioned, cancelled, and a check for $947.50, with the explanation that the two notes totaling $3,500, plus *142 interest thereon in the amount of $52.50, and the check, represented a distribution of $4,500 to her. The petitioner's wife received a check dated May 22, 1935 for $1,693.52, representing the second and final distribution to her from her father's estate. She deposited $1,500 of that amount on June 1, 1935 in an account previously opened in the name of "Mary Louise Buckley by Father". The account at that time had a credit balance of 40 cents. The petitioner withdrew from that account between July 5, 1935 and August 12, 1937, $1,495. The petitioner and his wife had an understanding that his wife had invested $3,500 in his business through the cancellation of the two notes given to her father, of which $2,500 was to be her investment and $1,000 was to be an investment in the business on behalf of their daughter. The first time that their daughter knew that she had had any interest in any partnership business was on December 25, 1937. The petitioner obtained money from time to time from his mother which he used in the motion picture theatre business. No record was kept of the amounts which he thus obtained but he thinks the total was between $2,400 and $2,500. The record does not *143 show the period over which this money was obtained but it extended over a number of years. The record does not show what understanding, if any, there was with relation to this money at the times it was received by the petitioner. The petitioner, his wife, their daughter, and his mother entered into an agreement on December 27, 1937. The body of the agreement was as follows: "1. The parties hereby agree that they will become and be partners in business for the purpose and upon the terms herein stated. "2. The firm name of the partnership shall be BUCKLEY AMUSEMENT ENTERPRISES. "3. The business to be carried on by the partnership is that of owning, leasing and operating moving picture theatres and all such equipment and property used or useful in the operation of such business and, also, to lease, own, hold, buy and sell real estate used or useful in the foregoing business (acting as principal only in respect to the said real estate and not as broker or agent) and to do all other things necessary or incidental to the operation of the said moving picture business. "4. The principal office of the said partnership shall be in the Borough of Mount Carmel, County of Northumberland *144 and Commonwealth of Pennsylvania, and the business of the said partnership shall be conducted at such places and in such communities where the partners may desire to operate moving picture theatres. "5. The term for which the partnership is organized is to continue until such time as any of the partners may give notice of withdrawal. "6. The capital of the said partnership is to be Ten Thousand ($10,000.00) Dollars of which each of the partners is to contribute the amount following his name as set forth below, and they are to share in the profits and losses in the same proportion: - William R. Buckley
$2,500.00
Mary E. Buckley
$2,500.00
Mary Lou Buckley
$2,500.00
Mary J. Buckley
$2,500.00
"7. Each of the partners is to use his best endeavors to promote the interests of the firm. "8. Books of account of the partnership shall be kept at the principal office and shall be, at all times, open to inspection by any partner. "9. Within Sixty (60) days of the end of each fiscal year, a complete statement of the condition of the partnership shall be made and an accounting between the partners shall be had and the profits and losses of the preceding year shall *145 be divided and paid or contributed. The fiscal year shall begin on January 1, 1937. "10. Each of the partners shall be permitted to draw from the funds of the said firm such sums as shall be agreed upon between the members of the partnership. "11. All questions of difference as to the management of the business shall be decided by a majority of the partners and no partner shall knowingly do any act in relation thereto contrary to the decision of the majority. "12. Any of the partners may retire from the partnership at the expiration of any fiscal year upon giving notice to the other partners Three (3) months notice of his intention to do so. "13. Upon dissolution of the partnership by reason of the death, withdrawal or other act of any partner, the remaining partners may, if they so desire, continue the business and they shall have the right to purchase the interest of such partner in the business, assets and good will, by paying the value of such interest as determined by the last annual inventory and accounting. Upon such payment, the retiring partner or his representatives shall execute and deliver to the remaining members all necessary conveyances of such interest. The *146 continuing members shall assume all the existing firm obligations, and hold the sellers harmless from all liability thereon. The continuing partners may use the former firm name if it does not contain the name of the retiring partner, except the surname. "14. In case any partner shall die before the expiration of the partnership, the surviving partners shall have the option of retaining his or her share in the capital of the partnership in the said business during the residue of the term of the partnership, such option to be signified to the representatives of the deceased partner; and in case the surviving partners or partner shall elect to do so, the said business shall be carried on during the residue of the said term, as nearly as may be according to the provisions of these presents, but so that the representatives of the deceased partner shall succeed to his share in the business, and be substituted for him as silent partners only; provided, that in case the surviving partners or partners shall continue the business by virtue of such option as aforesaid, all proper instruments for carrying the provisions of this clause into effect shall be executed and made between them or him *147 and the representatives of the deceased partner. "15. Upon the final dissolution of the firm by lapse of time or otherwise, the said business shall be wound up, the debts paid and the surplus divided among the partners in accordance with their interest therein." The name Buckley Amusement Enterprises was not registered under the Pennsylvania Fictitious Names Act. The petitioner's mother executed a bill of sale on January 2, 1942 to transfer to her daughter Mary Estelle Buckley her one-fourth interest in the partnership known as the Buckley Amusement Enterprises. Mary J. Buckley died on December 6, 1942. No change was ever made in the agreement of December 27, 1937. The Treasury Department was notified in connection with social security at some time not disclosed by the record that Mary E. [for Estelle] was an owner of Buckley Amusement Enterprises. Mary J. Buckley, Mary E. Buckley, Mary Louise Buckley, and Mary Estelle Buckley had no business experience whatsoever, took absolutely no part in the affairs of the business conducted under the name of Buckley Amusement Enterprises at any time, and never intended to take any active part in that business. The petitioner employed *148 a general manager who employed a manager for each of the theatres being operated. The petitioner also employed a bookkeeper. The general manager procured the films for the theatres. The bookkeeper prepared all checks and the petitioner signed all checks. The checks for the business were drawn upon the personal bank account of the petitioner until 1937 when he opened an account under the name of the Buckley Amusement Enterprises. Thereafter business checks were drawn upon that account. The petitioner alone had authority to draw checks on the two accounts. The general manager of the theatres called the petitioner every night to report on the operations of that day, and every Saturday night to report the approximate profit or loss for the week. The bookkeeper prepared and submitted to the petitioner every Monday an audit of the transactions for the preceding week. An outside accountant made an audit of the books every three months for the petitioner. The petitioner went to the office of Buckley Amusement Enterprises only occasionally for conferences with the manager and occasionally the manager came to the petitioner's office for a conference. The petitioner supervised all physical changes *149 in the buildings used as theatres and all expenditures made in the business. The books of Buckley Amusement Enterprises were not shown to the Court or offered in evidence. The record does not show whether or not these books contain any capital accounts or whether or not they contain any entries showing withdrawals by or distributions to any person. They did not contain withdrawal accounts. Money was transferred to suit the petitioner's convenience between his personal bank account and the bank account of Buckley Amusement Enterprises. The petitioner handled all of the affairs of the business as head of his family. The operations of the motion picture theatres resulted in a loss during 1935 and 1936 and the petitioner claimed that entire loss on his tax return. His wife and his daughter did not file returns for those years. The record does not show that Mary E. Buckley, Mary Louise Buckley, Mary Estelle Buckley or Mary J. Buckley ever received any of the profits of Buckley Amusement Enterprises, and none of them received any of the profits of that business during 1942, 1943 and 1944, except as Mary E. may have benefited from the purchase of a theatre in her name in 1943. Partnership *150 returns for Buckley Amusement Enterprises were filed for the years 1937 through 1944. The net income shown on those returns was as follows: 1937
$16,441.31
1938
6,057.00
1939
18,168.36
1940
28,339.95
1941
31,869.51
1942
39,311.25
1943
40,519.96
1944
48,054.02 Those returns showed that the income was distributable one-fourth to the petitioner, one-fourth to his wife, one-fourth to their daughter, and one-fourth to his mother up to 1942 and thereafter that one-fourth was shown as distributable to his sister. No depreciation of buildings was claimed on those returns. The following table shows the theatres operated under the name of Buckley Amusement Enterprises during the years 1942 through 1944 and when they were first leased: First
Leased
1931
State Theatre, Mount Carmel
1936
State Theatre, Mahanoy City (operated
during the first 6 mos. of 1942 only)
1942
Elks Theatre, Mahanoy City
1933
Capitol Theatre, Shamokin
1938
Majestic Theatre, Shamokin
The petitioner purchased in his own name the Majestic and Capitol Theatres in Shamokin in 1939 and 1941 using funds of Buckley Amusement Enterprises to make the purchases. He *151 used funds of Buckley Amusement Enterprises thereafter to make payments on the mortgages on those properties. The record does not show how those uses of money of Buckley Amusement Enterprises were recorded on the books of that business. The petitioner reported rent from those properties and claimed depreciation thereon in his income tax returns following the purchases. He showed the cost of the buildings as $120,000 each on his 1942 return. The State Theatre in Mount Carmel was purchased with funds of Buckley Amusement Enterprises on May 8, 1943 and title was taken in the name of Mary E. Buckley. Thereafter she reported rent from that property and claimed deductions for depreciation thereon on her returns. She showed the cost of the building as $16,000 on her 1943 return. The record does not show how funds used to purchase that theatre were handled on the books of Buckley Amusement Enterprises. The petitioner, his wife, his daughter, and his sister did not carry on a business as partners during the taxable years and never intended, during that period or at any earlier time, to carry on a business as real partners. Opinion MURDOCK, Judge: The petitioner contends that there was *152 an oral partnership agreement beginning on or about October 31, 1934 which was merely reduced to writing on December 27, 1937. However, the evidence fails to support this contention. The record does not indicate that the petitioner had any understanding whatsoever with his mother during that period. His daughter testified that she never heard of any partnership business in which she was interested until Christmas 1937. The wife probably had some kind of an understanding with the petitioner that $3,500, represented by cancelled notes which she accepted as a distribution from her father's estate, would thereafter be regarded as an investment in some part of the petitioner's business, $2,500 on her behalf and $1,000 on behalf of the daughter. But there is no evidence of any details of this arrangement. The petitioner filed individual returns claiming the entire losses of the business for 1935 and 1936 which indicates that he regarded the business as his own and not that of any partnership. It can not be found from this record that there was a partnership agreement of any kind prior to December 27, 1937. Cf. . Furthermore, it is obvious that the *153 $3,500 represented by the notes did not in any way help the petitioner to raise a portion of the $7,000 which he needed to make good his check for $7,000 to buy out Bodner. The daughter's funds were not used for that purpose either. The agreement dated December 27, 1937 would be a sufficient agreement to create a partnership for all purposes if the parties intended to carry out its terms and if those terms were in accordance with the actual facts. But the words of the agreement alone are not determinative of the question here in issue. . It is apparent that a check for $947.50 belonging to the petitioner's wife, and $352.50 which the petitioner obtained from his mother, were used to buy out Bodner. But the record does not show the use to which the petitioner put other funds which he says he obtained from his mother and Mary Lou. He said his mother gave him money at different times to keep the movies going and that he robbed Mary Lou's account but, in this connection, he mentioned the Imperial Theatre which was not one of those involved in the alleged partnership operation. The findings show affirmatively that no part of the $3,500 *154 item originating in notes of the petitioner given to his wife's father was ever contributed to or made to form a part of the alleged partnership operation. The petitioner at most merely recognized that to the extent of $3,500 his wife and his daughter had an interest in some business of his. Thus, it can not be assumed that the wife, mother and daughter had advanced $2,500 each to the partnership business. Furthermore, there is no evidence to indicate that the petitioner's interest in the business at that time was worth as little as $2,500. It was then apparent that the profits of the business for 1937 would amount to over $16,000 and the indications are that his interest in the business was worth much more than $2,500. It is now conceded, contrary to the agreement of December 27, 1937, that the women were not expected to do anything to promote the interests of the business or to have any say in its management. The record does not show what books of account were kept for the business or that they were in any way adequate to show the interests of the several persons mentioned in the agreement. It does not show that there was any accounting among the four persons or division of profits *155 at the end of each year, or that any of the women ever made any withdrawals of funds from the business. No change in the partnership agreement was made to reflect the effort which the mother made to transfer her interest to her daughter or to reflect the death of the mother. The petitioner seems to think that the absence of any tax avoidance purpose is obvious, but it is not so obvious in view of the facts that the petitioner in his returns prior to 1937 had not recognized the existence of any partnership, the business was not profitable in 1935 and 1936, and that near the close of 1937, when it was apparent that the business would have substantial profits for 1937, the agreement was entered into effective retroactively as of January 1, 1937, and the profits were split four ways for income tax reporting purposes. Furthermore the prospects for future profits were good. The record does not show that the petitioner's mother or sister ever benefited in any way from the business. The petitioner, his wife and his daughter no doubt lived off, and the petitioner probably educated his daughter from, the profits of the business. But otherwise the daughter did not benefit, whereas the petitioner *156 withdrew funds at will. He withdrew large amounts to buy two of the theatres for himself. Apparently funds in a much smaller amount were withdrawn from the business to buy a theatre in the name of the petitioner's wife. If this transaction had been more fully set forth in the record it might help the petitioner's case, but the record does not show how the withdrawals were accounted for on the books of the business or whether the wife had any voice or choice in the matter. It does not eliminate the possibility that this was another instance in which the petitioner used the funds of the business to suit his own purposes without consulting anyone. Counsel for the petitioner resisted several strong suggestions during the course of the trial that he should clarify or supply information on a number of matters. Doubts and uncertainty left by the evidence do his case no good. The initiation and success of this business was due to the activities of the petitioner. Although he accepted and used funds belonging to his wife, his mother and his daughter, the amounts were not large and he apparently used them freely to serve his own purposes without objection or question by those members of his *157 family. The petitioner ran the business after December 27, 1937 in exactly the same way that he had conducted it prior to that time. He seems to have done just about as he pleased at all times in conducting the business and in using its funds. There is little or no reality or genuineness in the operation of the alleged partnership. There was no real community of interest in the profits and losses of the business. The record as a whole does not justify a reversal of the determination of the Commissioner. Decision will be entered for the respondent.